Judgment rendered December 18, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,055-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

ARMOND JAMAR BURGY                          Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 386,902

Honorable Donald Edgar Hathaway, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Peggy J. Sullivan

ARMOND JAMAR BURGY                     Pro Se

JAMES E. STEWART, SR.                  Counsel for Appellee
District Attorney

JASON W. WALTMAN
REBECCA A. EDWARDS
KENDRA S. JOSEPH
Assistant District Attorneys

* * * * *

Before STEPHENS, ROBINSON, and ELLENDER, JJ.

**STEPHENS, J.**

This criminal appeal arises out of the First Judicial District Court, the Honorable Donald E. Hathaway, Jr., Judge, presiding. The defendant, Armond Jamar Burgy, originally charged with second degree murder in the death of Katrayvon Hill, was convicted by a jury of manslaughter. Thereafter, he was sentenced by the trial court to 40 years' imprisonment at hard labor. The instant appeal was filed by the defendant. Burgy urges that the evidence is insufficient to support the jury's verdict, and the trial court's 40-year sentence is excessive. For the reasons set forth, we affirm the defendant's conviction and sentence.

## FACTS/PROCEDURAL BACKGROUND

The defendant, Armond Jamar Burgy, was charged by bill of indictment filed March 18, 2022, with the second degree murder of Katrayvon Hill on December 23, 2021. On that day, Don Midland, who worked for Republic Services, was picking up the trash from the Neighborhood Store located at the corner of Madison and Laurel Streets in Shreveport, Louisiana. When he pulled into the parking lot, he saw a man wearing a blue jacket holding a gun talking to a man wearing a black shirt. Midland also observed a white car, which he saw drive off. Midland noticed what he described as a gray car pull up. Midland saw a man with dreads, presumably Burgy, pointing at the man in the blue jacket. Midland went about his business, and as he was emptying the trash bin, he heard four shots. The man who was in the gray car (Burgy) sped past Midland, who then saw the other man later identified as Katrayvon "Little Lakeside" Hill lying on the ground. Midland left in his truck heading the same direction as

the gray car. When he saw a Shreveport police officer, Midland reported what he had just witnessed.

Officer Delandro Washington was at the corner of Lakeshore and Portland Streets writing a report when Midland approached him to report the shooting. Ofc. Washington notified dispatch and drove to the store, where he saw a bleeding man lying on the ground. Ofc. Washington promptly began CPR. There were no people on the scene when the officer arrived, but family members soon began to show up, and the scene had to be secured. Several other officers who had been responding to a 9-1-1 hangup call from a possible domestic situation at a house on nearby Oxford Street[1] came to the store when they heard the shots and the dispatch report of a shooting at the store at 1528 Madison Street.

Officer J.T. McNally testified that he saw Hill on the ground with what appeared to be a gunshot wound to his chest. Officers spoke with witnesses on the scene, including Hannah Clark, and learned that the suspect had left the scene in a blue Mazda with her phone.[2] The "Find My Friends" app was used to locate Ms. Clark's cell phone, which led police to the blue Mazda which they recovered. Burgy was taken into custody later that morning during a traffic stop when a police officer who knew him recognized him riding as a passenger in another vehicle.

Corporal Anthony Haines testified that he assisted Ofc. Washington in providing CPR to Hill until the fire department arrived to take over. At that time, as the officers were canvassing for witnesses, they learned the store

---

[1] As it turns out, the 9-1-1 call came from the home where Burgy lived with Hannah Clark (also referred to as Hannah Welch), his girlfriend and the mother of his son.

[2] Ms. Clark was apparently unable to be located to testify at trial.

had security cameras which had recorded the incident. Cpl. Haines explained to the jury what he observed as the video was played for the officers by the store clerk.

The footage shows the victim walking around the parking lot "quickly" with what Cpl. Haines thinks was a gun in his hand. Hannah Clark's white car pulls up and she opens her door to speak to Hill, apparently in an attempt to persuade him to get into her car. Hill does not do so. Later on, Ms. Clark got into her car and was out of the camera's view. The footage doesn't show whether she left the scene or went around the side of the store. At that point, another car pulls up, "driving pretty erratic," and another male gets out of the car. The men "kind of got into it" face-to-face, shoving on each other. The guy drives off in his vehicle, but soon he returns. The victim still has a gun in his hand, but now the other guy has a gun. The two keep on shoving one another, and then the man shoots the victim. After the shooting, the man gets into his car and drives away.

The officers continued to review the video and were able to see that the victim's firearm had been picked up by one of the bystanders. They learned that the weapon was given to Hill's mother, Crystal Hill, who put the gun in her truck and left the scene. The weapon was later secured and seized by the police.

Ms. Hill testified that while she is Katrayvon Hill's mother, she is also Burgy's cousin. Ms. Hill described the relationship between her son and Burgy as they were growing up as the "best of friends." On the date of the shooting, December 23, 2021, Ms. Hill was heading to drop her son off at the store after stopping to pick up Darius Adams along the way. When they got to the store she saw two cars at the stop sign. The driver of the white car

3

at the stop sign was Hannah Clark.  Hill got out of Ms. Hill's truck and started walking toward the store.  Burgy, who was in the second car at the stop sign, backed his car into the store's parking lot.  According to Ms. Hill, when Burgy got out of his car, he was demanding of Hill, "where my hundred dollars at?"  Ms. Hill got out of her truck and stood between the two men because Burgy had a gun tucked under his arm.  A verbal argument about whether Hill owed Burgy money then took place.

Ms. Hill stated that she told her son to give Burgy the money because he had a gun.  She admitted that Burgy had not pointed the gun at anyone.  According to Ms. Hill, once she made her son give Burgy the hundred dollars he claimed he was owed, he left.  Ms. Hill then left to go to Burgy's house to find out what was going on, but turned around when she saw a police officer there.  Ms. Hill returned to the store to tell her son to leave, only to find him fatally shot.

Darius Adams[3] was across the street when Ms. Hill came back to find her son lying on the ground.  Adams had taken Hill's gun from him after the shooting.  Ms. Hill took that gun, put it in her truck, and left.  Ms. Hill returned later and, at some point, she turned the gun over to the police.  Ms. Hill admitted that her son habitually carried a gun, but denied he had a habit of threatening others.

The defendant, Armond Burgy, also testified about what happened between him and his cousin Katrayvon Hill.  Burgy explained that Hill had lived with him for about two years.  Burgy had a young son around whom he did not allow weapons.  Hill always had a gun and would flash it around the

---

[3] Adams, also known as "Little Lakeside," did not testify at Burgy's trial.

house. According to Burgy, he and his cousin had a couple of arguments, over animals and Hill flashing guns, among other things. During one of these incidents, Burgy asked Hill to leave his yard. Hill did so, but when he got to the curb, he pulled his gun and pointed it at Burgy before getting into a truck and leaving. Burgy testified that he felt threatened by Hill, who had pulled guns on him and told him that he would kill him.

The most recent incident had been after Burgy was released from jail on November 26, 2021. He came home from Texas to find his belongings out of place or gone. He told Hill he had to leave, and Hill pulled a gun and threatened him. After the incident in November, things had been good leading up to December 23, 2021. On that day, Burgy testified that he asked Hill to pay him money that he was owed, but said he would just take the $100 Hill had on him. At that time, Burgy and his son's mother, Hannah Clark, had been arguing and he wanted to leave.

Burgy testified that he left the store, but returned because of threatening phone calls Crystal Hill was directing at him and his son. In one call, Ms. Hill said she was going to get her gun. By the time Burgy got back to the store, Ms. Hill was gone. Burgy confronted Hill about having guns pulled on him as the two men stepped up to each other. Burgy told Hill, who had his gun out, to back up. Hill had told Burgy he would kill him on multiple occasions. The situation deteriorated into the two men getting into a shoving match. According to Burgy, the shoving was instigated by Hill. Burgy said that Hill told Burgy again he would kill him. Believing he was going to be shot, Burgy fired what he said were two shots. Dr. James Traylor with the Caddo Parish Coroner's Office testified that Hill sustained three gunshot wounds which caused in his death.

5

Detective Montreal Jackson of the Shreveport Police Department testified that he and Burgy were friends. While he was not assigned to this case, Det. Jackson spoke with Burgy to find out where his gun was. Based on the information provided by Burgy to Det. Jackson, the gun was recovered. Three spent cartridge casings were located in the parking lot of the Neighborhood Store. One projectile was recovered during the autopsy of Hill. According to Michael Stelly, a firearms identification expert from the North Louisiana Crime Lab, the cartridge cases recovered from the scene were determined to have been fired by Burgy's weapon. The projectile recovered during the victim's autopsy had the same class characteristics, but a positive identification could not be made.

At the conclusion of trial, the jury returned the responsive verdict of manslaughter. The jury was polled, and no irregularities were noted. Burgy was sentenced on January 18, 2024, to serve 40 years' imprisonment at hard labor and to pay court costs. A motion to reconsider sentence was filed on February 15, 2024, and denied without a hearing. The instant appeal was filed by the defendant.

## DISCUSSION

### *Sufficiency of the Evidence*

Burgy first urges that the State failed to prove beyond a reasonable doubt the evidence introduced by the State at trial was sufficient to establish beyond a reasonable doubt that the defendant was guilty of manslaughter as it did not prove that he was not acting in self-defense when the victim was shot. The evidence shows that, in the moments before the shooting, Burgy was confronted by Hill, not for the first time, with a gun. Burgy and his son

6

were threatened by Hill. According to the defendant, the difference is this time, he felt like he had no choice but to protect himself.

Burgy contends that he did not set out to kill Hill. The evidence presented at trial shows that, when he first saw Hill at the store, there was already a gun in Hill's hand. Burgy then left and returned, but only because family members whom he believed he was close to (Hill's mother, Crystal Hill) were threatening not only him, but his child. Burgy points out that only Ms. Hill described Burgy as having a gun during the first encounter between him and Hill. Even then, she admitted that he did not point it at anyone.

Ms. Hill admitted her son had a habit of carrying a gun. Midland, the man emptying the trash receptacle outside of the store, described Hill as being armed on that day, prior to Burgy's arrival. Midland testified that he did not see Burgy with a gun. When Burgy got back to the Neighborhood Store, Ms. Hill was not there, having left after telling him she was going to get a gun. Hill still had his gun on him, and as the two men argued, he again threatened Burgy. It was only at this point that Burgy fired the shots that resulted in Hill's death.

Burgy argues that the evidence shows that Hill was brandishing a weapon and making threats. There is testimony to show that this was something Hill had done previously. On the date of the shooting, Burgy claims he responded to those threats. It is his position that his response was necessary to protect himself from imminent danger of death or great bodily harm. This was not manslaughter, urges Burgy, it was self-defense.

According to the State, its evidence proved beyond a reasonable doubt that the killing of Katrayvon Hill was not committed in self-defense.

7

Because Burgy was the aggressor in the situation, he could not claim self-defense as justification for the shooting. The evidence was sufficient to prove he acted with specific intent to kill or inflict great bodily harm, which was required to prove second degree murder. However, the jury returned a responsive manslaughter verdict, either as a compromise verdict or because it found that there was sufficient provocation to reduce the verdict to manslaughter. Either way, urges the State, the jury's leniency benefited the defendant, who escaped a mandatory life sentence had he been convicted (as charged) of second degree murder.

Under the due process standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, 443 U.S. at 319, 99 S. Ct. at 2789; *State v. Stockstill*, 19-01235, p. 4 (La. 10/1/20), 341 So. 3d 502, 505-06. This standard, now codified in La. C. Cr. P. art. 821, does not afford an appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Instead, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*,

8

36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So. 2d 566, and 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert. denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed. 2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Coffey*, 54,729 (La. App. 2 Cir. 9/21/22), 349 So. 3d 647, *writ denied*, 22-01574 (La. 12/20/22), 352 So. 3d 89; *State v. Wilson*, 50,418 (La. App. 2 Cir. 4/6/16), 189 So. 3d 513, *writ denied*, 16-0793 (La. 4/13/17), 218 So. 3d 629.

In the present case, Burgy was charged with second degree murder in violation of La. R.S. 14:30.1, which is defined, in part, in section (1) as the killing of human being when the offender has a specific intent to kill or inflict great bodily harm. However, the jury convicted the defendant of the lesser offense of manslaughter.

La. R.S. 14:31(A)(1) provides that manslaughter is a homicide which would be murder under either article 30 (first degree murder) or article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. Subsection (2) of La. R.S. 14:31(A) provides that manslaughter is a homicide committed without any intent to cause death or great bodily harm.

Because Burgy claimed that he shot the victim in self-defense, the State also had the burden of proving beyond a reasonable doubt that the

9

homicide was not perpetrated in self-defense. *State v. Taylor*, 03-1834, p. 7 (La. 5/25/04), 875 So. 2d 58, 63. In determining whether a defendant had a reasonable belief that the killing was necessary, factors that may be considered include the excitement and confusion of the situation, the possibility of using force short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Johnson*, 55,254, pp. 9-10 (La. App. 2 Cir. 8/09/23), 370 So. 3d 91, 98.

When a defendant challenges the sufficiency of the evidence in a self-defense case involving a homicide, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of others. *State v. Stockstill*, 19-01235, p. 5, 341 So. 3d at 506; *State v. Johnson*, *supra*. S*ee, e.g., State v. Matthews*, 464 So. 2d 298, 299 (La. 1985) ("On review, the question therefore is not whether a rational fact-finder could have found that the state had proved the essential elements of the offense beyond a reasonable doubt. The applicable standard is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in defense of others.").

In the instant case, while the unanimous jury found insufficient evidence to convict Burgy of second degree murder, it nonetheless found that the evidence presented by the State established that he was guilty of manslaughter and that he did not act in self-defense. The evidence, viewed in the light most favorable to the prosecution, was sufficient for the jury to find the elements of manslaughter proven beyond a reasonable doubt. Under

10

this same standard, the evidence was sufficient for the jury to find beyond a reasonable doubt that the homicide was not committed in self-defense.

Not only did the jury have eyewitness testimony, there was video evidence of the shooting. The footage from the security camera at the Neighborhood Store showed two encounters between Hill and Burgy. Both were initiated by Burgy. Ms. Hill and Burgy testified that Burgy first approached Hill to collect money from him, and that Hill paid the defendant $100. Although Burgy denied having a gun on him, Ms. Hill testified that he had a gun at his side. Because the defendant was not fully visible on the video footage during the first encounter, there is no verification as to whether Burgy was armed at that time.

Hill had a gun in his hand from the time he got out of his mother's truck. The security footage showed that Burgy started to leave in his car, but he stopped abruptly and got out beside the driver's door as the victim and Ms. Hill walked toward his car in what appeared to be an aggressive manner. However, Hill did not point his gun at Burgy, who got back into his vehicle and drove away. Burgy's retreat ended the first encounter and should have ended whatever was going on. Clearly acting as the aggressor, Burgy returned to confront Hill a second time. Within about 30 seconds of leaving, Burgy drove back into the parking lot beside Hill, popped out the car clearly armed with a gun in his right hand, and angrily confronted Hill. The two men circled and were close together when Burgy shoved Hill back and then as Hill started to step forward, Burgy shot him, causing him to fall forward to the ground. Burgy's testimony that Hill shoved him was refuted by the security video footage. Hill did not shove Burgy and did not raise his gun from his side during the confrontation.

11

In this second encounter that ended with Hill shot three times and dying on the ground, Burgy was clearly the aggressor. The defendant, by returning to confront Hill with a firearm, shoving him, and then shooting him three times at close range in the neck and chest, shows that he was the aggressor and that he acted with specific intent to kill. As the aggressor, Burgy could not claim self-defense. *See*, La. R.S. 14:21.

Apparently the jury found the testimony by Burgy and his defense witnesses about supposed threats made by the victim to be contradictory and unbelievable. For instance, Burgy claimed that Hill threatened him, yet Burgy also testified that Hill flashing around his gun did not make him nervous. The defendant's sister testified that Hill pulled a gun on Burgy some weeks before the shooting and supposedly made a threat against him the day before the incident, yet she later testified that the two men were not "beefing." On the day of the shooting, however, Burgy did not feel threatened apparently—he confronted Hill for money he owed, left the scene, then returned to confront Hill a second time, ***knowing that Hill was armed with a gun***.

The evidence was sufficient to support the jury's verdict in this case. This assignment of error is without merit.

### Excessiveness of Sentence

In arguing that the trial court imposed an unconstitutionally excessive sentence, Burgy notes that the trial court did not order a presentence investigation prior to imposing sentence. The trial court listed Burgy's prior convictions as possession with intent to distribute a schedule I narcotic and a misdemeanor domestic abuse battery conviction. The trial court noted that the 31-year-old defendant, who had an 11th grade education, had pending

12

charges for possession of more than five but less than 50 pounds of marijuana in Texas, domestic abuse battery (strangulation), simple robbery, and possession of a firearm by a convicted felon. Burgy added he had a six-year-old child and had employment prior to COVID.

The trial court discussed the factors it took into consideration in fashioning a sentence in this case. The aggravating factors considered by the trial court were threats of or actual violence, a significant permanent injury to the victim, the endangering of a human life by discharging a firearm, and the use of a firearm or other dangerous weapon. Burgy points out that the use of actual violence and the permanent injury to Hill are elements of the crime of manslaughter and should not be considered as aggravating factors for sentencing purposes. Because the legislature based the sentencing range for manslaughter on the elements of the offense, these two "aggravating factors" were already taken into account.

The trial court found no mitigating circumstances. Burgy points out that he has a young son, and Hill was armed at the time of this incident. The trial court, substituting its opinion for the verdict of the jury, opined that this was a second degree murder. Unable to impose a life sentence, the trial court imposed the maximum sentence available to it. Burgy is not the worst of offenders, and this was not the worst of offenses. This was a tragedy for this family. According to the defendant, incarcerating him for most of the rest of his life will not make it any less of a tragedy, and he urges that the 40-year hard labor sentence is a needless imposition of pain and serves no legitimate purpose.

The State argues that the 40-year sentence, although the maximum for manslaughter, is not excessive under the facts and circumstances of this

13

case. Burgy, charged with second degree murder and facing the possibility of a life sentence, benefited when the jury came back with the responsive verdict of manslaughter. Furthermore, the trial court's reasoning shows adequate compliance with La. C. Cr. P. art. 894.1 in tailoring the sentence to this defendant, a prior convicted felon who also had pending charges at the time of sentencing.

The trial court noted that it was familiar with Burgy's family history from the court proceedings and Ms. Hill's statement to the court at the sentencing hearing. The trial court considered Burgy's criminal history, which included a 2015 conviction for possession with intent to distribute a Schedule I narcotic for which he was sentenced to six years at hard labor suspended and three years of active supervised probation, and a misdemeanor domestic abuse battery with child endangerment in 2017 for which he served 90 days in parish jail. The trial court also took into account Burgy's pending charges, which included a Texas possession of marijuana of less than 50 but greater than five pounds, as well as charges before the sentencing court of domestic abuse strangulation, simple robbery, and possession of firearm by a convicted felon.

The trial court found all three factors of La. C. Cr. P. art. 894.1(A) to be applicable, and concluded there was an undue risk that Burgy would commit another crime during a suspended or probated sentence, he was in need of correctional treatment, and that a lesser sentence would deprecate the seriousness of the crime. The trial court found the following aggravating factors under La. C. Cr. P. art. 894.1(B) to be applicable: Burgy used threats of or actual violence in committing the offense; the offense resulted in significant permanent injury to the victim, who was killed; Burgy used a

14

dangerous weapon and foreseeably endangered human life by discharging the firearm while committing an offense that has, as an element, the use, attempted or threatened use of physical force against the person or property of another; Burgy used a firearm while committing an offense having as an element the use, attempted use, or threatened use of physical force against the person or property of another *and* which by its nature involves a substantial risk that physical force may be used in committing the offense; and Burgy's criminal history. The court found no mitigating factors under La. C. Cr. P. art. 894.1(B) to apply.

According to the trial court, Burgy committed second degree murder, not manslaughter, and he did not act under strong provocation. In light of the above findings, the trial court sentenced the defendant to 40 years at hard labor with credit for time served and designated the offense a crime of violence. The trial court then advised Burgy of the time limitations for appeal and post-conviction relief. The State urges that the trial court's sentencing outline and transcript from the hearing show that adequate consideration was given to the guidelines and La. C. Cr. P. art. 894.1 factors. The sentence is not unconstitutionally harsh and therefore not excessive, argues the State, which urges this Court to affirm Burgy's 40-year sentence.

A defendant's claim of an excessive sentence is reviewed by examining whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1 and whether the sentence is constitutionally excessive. *State v. Vanhorn*, 52,583 (La. App. 2 Cir. 4/10/19), 268 So. 3d 357, *writ denied*, 19-00745 (La. 11/19/19), 282 So. 3d 1065. A review of the sentencing guidelines does not require a listing of every aggravating or mitigating circumstance. *Id.*

15

A sentence violates La. Const. art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. O'Neal*, 55,559 (La. App. 2 Cir. 2/28/24), 381 So. 3d 273, *writ denied*, 24-0424 (La. 10/15/24), 394 So. 3d 817; *State v. McKeever*, 55,260 (La. App. 2 Cir. 9/27/23), 371 So. 3d 1156, *writ denied*, 23-01429 (La. 4/16/24), 394 So. 3d 149. For a sentence to be considered excessive by constitutional standards, a reviewing court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock the sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and, therefore, is nothing more than the needless imposition of pain and suffering. *State v. Griffin*, 14-1214 (La. 10/14/15), 180 So. 3d 1262; *State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153, *writ denied*, 18-2052 (La. 4/15/19), 267 So. 3d 1131.

The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Griffin*, *supra*; *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. O'Neal*, *supra*; *State v. McKeever*, *supra*.

La. R.S. 14:31(B) provides that the sentencing range for a defendant convicted of manslaughter is imprisonment at hard labor for not more than forty years. Manslaughter is a violent crime. In this case, the evidence adduced at trial could have supported a second degree murder conviction and the exposure to a mandatory life sentence under La. R.S. 14:30.1. In

16

considering the nature of the offense, both the trial court and reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged. *State v. Lewis*, 09-1404, p. 4 (La. 10/22/10), 48 So. 3d 1073, 1078; *State v. Lanclos*, 419 So. 2d 475, 478 (La. 1982); *State v. White*, 48,788, p. 4 (La. App. 2 Cir. 2/26/14), 136 So. 3d 280, 282, *writ denied*, 14-0603 (La. 10/24/14), 151 So. 3d 599.

This general sentencing principle accommodates Louisiana's responsive verdict scheme which provides the factfinder, ordinarily a jury in felony cases, the discretion to return verdicts for lesser included offenses against the weight of the evidence presented at trial. *State v. Lewis*, *supra*; *State v. Porter*, 93-1106, p. 4 (La. 7/5/94), 639 So. 2d 1137, 1140. Louisiana courts have found the fact that the evidence might have supported a verdict of second degree murder is an appropriate consideration where the defendant has been convicted of a lesser offense. *See*, *State v. Lewis*, *supra*; *State v. Gaines*, 52,536, p. 4 (La. App. 2 Cir. 2/27/19), 266 So. 3d 948, 951, *writ denied*, 19-00773 (La. 9/17/19), 279 So. 3d 379; *State v. White*, *supra*.

While the sentence imposed by the trial court in this case, 40 years' imprisonment at hard labor, is the maximum penalty for the offense of conviction, it was nonetheless within the statutory limits provided for a defendant convicted of manslaughter. Under the facts and circumstances of this case, we cannot say that it is excessive by constitutional standards. This court notes that, as found by the trial court, the evidence arguably supports a conviction for second degree murder. The incident was captured on video, and there was eyewitness testimony. The defendant withdrew from his initial conflict with the armed victim (which Burgy started over an alleged

17

debt), yet came back to revive their beef even though Hill had paid him the money he allegedly owed. This time, Burgy, a convicted felon prohibited by law from possessing a firearm, was himself armed. The defendant escalated the argument by shoving the victim, then shooting him three times in the neck and chest before fleeing the scene. This assignment of error lacks merit.

## CONCLUSION

For the reasons set forth above, the conviction and sentence of the defendant, Armond Jamar Burgy, are affirmed.

**AFFIRMED**.